Good morning, Your Honors, and may it please the Court, I'm Michael Wolf for the Plaintiff's Appellants. I would like to reserve five minutes of time for rebuttal, if I may. The issue in this case is what is enough to state a claim upon which relief can be granted concerning the breach of fiduciary duties in the administration of a retirement plan. We've provided detailed allegations, both in our original complaint and in our amended complaint, that plausibly showed a flawed process that was tainted by a failure of effort, competence, or loyalty by providing imprudent investment options in this retirement plan and causing the plan to incur excessive administrative expenses. The district court wrongly held that that was not enough, and the district court held the plaintiffs to a standard, an impossible standard, of pleading directly what exactly Chevron, the fiduciary of this plan, did. Now, if I understand the standard correctly, if your allegations only amount to a possibility that you would prevail and the — and Chevron offers an innocent explanation based on the same facts, you have to go beyond that and show that there is only — that the innocent explanation can't be true. So maybe we should go through this count by count. Your first count seems to be that in addition to — or maybe not in addition to offering a choice that was money market. A stable value fund versus a money market fund. A stable value fund. Now, this all seems to be based on hindsight. It looks as though the experience was that the stable market funds did better. And so it seems to me there's sort of an innocent explanation here, that the money market funds are safe. Everybody knows they're safe. Well, Your Honor, so there are a number of problems with that. First of all, it's not hindsight, because the evidence that we had — and again, it's evidence at this point in the complaint — is that the superiority of stable value funds over money market funds extended back to 1989. So that any employer or any fiduciary, ERISA fiduciary, who included an optional money market fund in its portfolio would have breached its fiduciary duty? No, Your Honor, because it's not a per se standard. But what you said is that stable market funds outperformed money market funds over the relevant period, and that allegation, which we take as true, is sufficient to create a plausible case that they breached their fiduciary duty. So it seems to me what you're saying is if you can find anybody who had a money market fund over that time period, and you could show that stable funds outperformed them, then you would have a triable case of breach of fiduciary duty. Tell me where I'm wrong. It's not a triable case because it's not summary judgment. You know you would have a case that survived a motion to dismiss. So that everybody in the country who had a money market fund during that period can — a complaint could be filed against them that would survive a motion to dismiss. Well, that's not necessarily true, Your Honor, because some plans are too small to be able to have stable value funds in their portfolios. This plan is one of the largest plans in the country. It had over $800 million in the money market account. It clearly had the ability to use a stable value fund. In fact, Vanguard, who it's using to provide the investment options and who provided the money market account in this plan, itself had a stable value fund that could have been used by the plan. So all of those factors together show that it's plausible that Chevron never considered a stable value fund. Are stable value funds and money market funds, do they equally protect the principal? Yes, they do, Your Honor. Well, a stable value fund can have a bond in it, for instance. A stable value fund is based on using bonds. That's certainly true, but it's also — there's also commitments by insurance companies to pay a stable value. In fact, it has bonds in it. If the interest rates go up, the bond value goes down. So how is it that they protect the principal in the same way? Because of the commitments that are provided by what's called the stable value wrapper providers ensure that it has a stable value. And Your Honor may find it hard to understand how they do it, but the history of these stable value investments going back to 1989 through to 2016 show that they have lower volatility than money market accounts and provide, in this case, three times the return of money market accounts and are superior investments. Did the report you submitted deal at all with the costs associated with stable value funds? The interest factor is net of cost, Your Honor. Right. So it doesn't cost any more. So the net return of the — It's a net. It's a net. In other words, you gave a net. No. I know — I'm talking about administrative costs and other things that the fund might be responsible for. Right. That's incorporated in the interest rate that's paid to the fund. So I'm still interested. Your position is really a per se position, is it not? Now that I have this report, if I can find anybody who had a money market fund during this time period who was big enough to have access to a stable value fund, they have per se committed a fraud. That's not at all the case. It's plausible that they have committed a breach. Well, what could their defense possibly be under those circumstances? Their defense possibly could be under the circumstances that in 2010 or shortly before that, we considered all of the factors that are involved in providing a stable value option for this plan instead of a money market account, including the particulars that would apply to this plan. We considered those factors, and we decided based on those factors that it was not appropriate for our plan. For any number, and that could be for any number of reasons. One could be we're expecting to lay off a third of our sales force, our employee staff, and that's going to void the stable value wrapper. Therefore, there could be a liquidity problem. That would be an instance where. Let me ask the question slightly differently. Must each option offered in a menu plan be the best possible option, or must it merely be a prudent option? It need only be a prudent option. And critically, the process need only be. No, let me. I'm still asking the question because you answered the question that I asked. If I offer somebody a menu ranging from very high risk to very low risk, does the very low risk have to be the very best low risk that I can find, or can I say here's a really dangerous fund in which you might get rich, and here's one in which you'll be safe, perfectly safe. You choose among them. Do I have to say the one in which you're going to be perfectly safe is better than another one in which you'll be perfectly safe? Yes, Your Honor. And the investment policy statement for this plan says that. For short-term investments, you have to, for the same level of safety, get the highest return that you can obtain out there. Now, we're not saying. And the difference here is not a slight difference. The money market fund is returning practically zero. A staple value investment. Returning three times zero. They're all pretty low. Three percent. But three percent, and this is $800 million that we're talking about, that's a difference of $26 million a year without incurring any additional risk. So the facts in this case are that you had this opportunity, no additional risk, three times the return, $25 million a year to these retirement accounts for these employees. That's at least plausible that what happened is that the defendants just never even considered a staple value fund. Now, do they have a defense? They might. Account two has to do with the retail shares and the institutional shares. The instant explanation here seems to be that the fees that were charged to the retail shares somehow or another offset some of the record-keeping fees. Is that the way? Is that the instant explanation? Yeah, I believe that's the argument you're making. Even though we say the fees were excessive, so that doesn't even make any sense. Well, you say the fees are excessive, but under the plausibility scheme, don't you have to sort of demonstrate that they are excessive? We do demonstrate that they're excessive. They're charging over $100 per participant when the evidence shows that they could have gotten $25 per participant. But what if these $100 per participant fees were, in fact, used to set off some of the record-keeping costs? No. The net record-keeping cost after whatever they're getting from these mutual funds is $100 per participant. So whatever offset they're claiming they're getting from the higher share mutual funds is paying administrative expenses for the plan that are three times, four times what they should have been. And, in fact, once we started getting involved, they changed things. It got a fee that was down to the land. Hold on a second. So you're saying that even though these excessive fees for the retail shares were being used to pay some of the administrative costs, the administrative costs themselves were excessive and, therefore, this doesn't work? Right. Because the higher cost share classes don't justify paying administrative expenses that were themselves excessive. Okay. And it's important to keep in mind in the Tibble case, right, it was found to be a primary duty to use the more expensive share class of mutual funds, even though the Court found that the fiduciaries didn't do that for the purpose of lowering the administrative expense for the plan, which the employer was paying. So the fact that you can use revenue sharing to pay some administrative expenses, whether they're excessive or not, has nothing to do with the question of whether it's prudent to provide participants the more expensive share class of a mutual fund, which the Court in Tibble said clearly it's not. Clearly, it's a breach of fiduciary duty. On those facts, that clearly states a claim. It was found to be a breach of fiduciary duty in the Tibble case. Now, can they come up with some argument as to, well, we considered it? And, again, this is important. If they show evidence that they considered the relevant factors and came to a reasoned decision, even if that decision turned out to have been wrong, they win because they had a prudent process. But you can't expect participants in a retirement plan to plead those facts because they're not privy to the process that the fiduciaries went through in making these decisions. Kennedy. But if you can't prove or if you can't plead those facts, then how do you have a case at all? Because it's process, after all, that we're talking about. What a prudent man would do knowing these facts. So that is a process decision, isn't it? It is, Your Honor. But if you're going to say that the participants have to know the process that they're not privy to and show why that process, their decisions behind closed doors, was wrong, these cases are never going to occur. And as the Court, Eighth Circuit, and Braden pointed out, that's going to eviscerate ERISA. Well, isn't that the problem with the Twombly and Ockville, that you can't discover whether or not you have a case or not? No, you do. The question is not whether you have a case or not, because this is just at the pleading level. The question is, do the facts plausibly show a tainted process? Well, that's the question. And here's the problem that I'm struggling with. Let's assume that you've plausibly alleged that they chose options that weren't as good as other options, which is, I think, the best you can do on these two things. It's a more expensive version of the exact same investment. Okay. Fair enough. Now, does that plausibly allege sufficient facts to show that they didn't make appropriate considerations and follow the appropriate process, or is it just you see the – that's the difficulty. What you're saying is the outcome, the outcome must plausibly show that the process was flawed. And I'm not sure that's true. I mean, the outcome often, the process is often perfect and the outcome is flawed. Right. But the question is, when the plaintiffs have no idea what the process was, what are they supposed to do? You can't expect them to plead something that they don't have access to. Well, no, I understand the problem. But if you must plausibly plead that the process was flawed, which – and that's a sort of – it's a shorthand, but I think you understand what I'm saying. You're saying I can – it is a plausible enough pleading that the process was flawed by showing that there could have been a better outcome. It's just not that – that's not what's being done here, Your Honor. At the time in 2010, you had investment options. They're providing the more expensive version of the exact same investment. You're just rephrasing what I said in a more favorable way to you. What you're really saying is now looking at the outcome, I can say this was a bad outcome. You should have chosen a better one. But that's not the point. Now, I don't know how you arrived at the process of choosing the bad one, but I don't have to know that when I plead my case. That's what you're saying, isn't it? No, Your Honor. That's not the outcome. That's the facts that were in existence at the time of the start of the wording question. So if I said facts instead of an outcome, would you have a quarrel with my wording? If the facts at the beginning of the time period in Simm showed that they had cheaper options they could have provided to the plan and did not provide those options, that plausibly alleges that there's a breach in Simm. Okay, good. That's the question I've been trying to ask you and you've been fighting me on. So your position is if you can show that at the time there was a better alternative, then that plausibly, that is enough of a plausible pleading that their process in choosing the worse alternative was flawed? Yes. Okay. Exactly. And remember, we don't have to rebut all possible lawful explanations for their conduct. That's impossible. That's the standard in Brayden and Allen, Eighth Circuit and Seventh Circuit. We only need to rebut concrete, obvious alternative explanations, and they don't provide that. Thank you. You've hit the red lights, unless my clients have my clients, my colleagues. I was talking about your clients. Be proud to be your client. And I'd make more money, unless my colleagues have more questions. Time's up. Sorry, I lost my page. Counsel, you may proceed. Good morning, Your Honors. And may it please the Court, John Hacker for Chevron. Can we just pick up where Judge Hurwitz left off? Yes, because I think it's a real problem. So let's assume that, make it any investment, that I show that the stock fund that you offer me in the 401K is just terrible compared to a comparable stock fund offered by somebody else. And that's all I've got. And I allege that. Do I then, have I then alleged enough to survive a motion to dismiss? So two related answers. The first is probably not, but the other one is it depends on the concrete allegations you make about what the fund is. Because a mere comparison, when the fiduciary has chosen a mainstream option from among a broad competitive field, that in itself, that decision in itself cannot be alleged plausibly that the decision was so facially imprudent that we need to engage in costly litigation into the basis for the decision. There has to be something more, some red flag that says something about a defect in the process, not just the decision itself. I think there are three uncontroversial principles that when you put them together sort of answer the Court's concerns and address Mr. Wolff's concerns about, you know, how can we ever plead a case. The first is the pleading standard, we've already adverted to, that requires the plaintiff to plead facts establishing more than the mere possibility of imprudent conduct. And Justice Breyer recently reminded us that that standard is an important mechanism for weeding out meritless claims in ERISA fiduciary actions. The second principle is the deference that is owed to discretionary decision-making by ERISA fiduciaries, who, remember, the statute literally defines by the exercise, by their exercise of discretionary authority. As the Armstrong case in the Seventh Circuit says, reviewing courts can't seat fiduciaries after the fact on a razor's edge, because they're always making decisions from a broad of a, from amongst a broad range of potential options against the backdrop of changing conditions and, and many different competing considerations. And the third uncontroversial principle is the ERISA's express and strict prohibition against reviewing fiduciary decisions through the lens of hindsight. Now, those principles do not mean, when you put them together, that no plaintiff can ever plead an ERISA fiduciary action. What they do mean is that when the plaintiff is not making concrete allegations about a defect in the process, which is a possible thing, and I'll talk about that in a moment, but where they don't have that, and they're trying to get there by alleging a problem with the substantive decision that was made, under those circumstances the complaint must allege facts plausibly establishing that no reasonable, similarly situated fiduciary could have made that decision at the time, given the information that was available. In other words, when a fiduciary chooses an option or takes some action that is objectively within the mainstream of choices that can be made. Sotomayor, and one of the difficulties is that we're at the motion to dismiss stage. Right. How do we know, as a matter of law, that the choices that the fiduciary made in this case were within the mainstream of choices? I think in this case you can certainly tell that they are. We've already talked about the money market fund versus the stable value fund choice. Their own complaint, their own complaint says that at the time something like 50 percent, I think their complaint points to a study that says 20 percent of 401K plans at the relevant time had no stable value fund in 2015, and basically alternative stable value is commonly money market. That's their complaint. So, you know, 20 percent did that. It's a mainstream choice. We all know money market funds are a mainstream, conservative, more liquid option. The GAO study that they rely on, which is not controversial, it doesn't make any huge claims, it just reports facts about money market funds versus stable value funds, that says in 2011 50 percent of plans did not have stable value funds, hence the alternative would have been money market funds. So we know that's a mainstream choice. Okay. I'm listening. We're listening. Yeah, absolutely. So turning to the claims, I mean, that's the main problem with the first claim of imprudent conduct here that the court below correctly held, that they failed to allege facts that would permit an inference that there was a defective process in the decision to choose this mainstream option. You can't just get to discovery and impose the enormous litigation cost of discovery, as Justice Breyer warned about, as the court has repeatedly warned about in Concord versus Frommard, and going back to Verdi against Howe, that we don't just welcome plaintiffs suing arrested fiduciaries after the fact for decisions that were made that on their face were mainstream. You need to come in with some sort of red flag that suggests some defect in the process. That's cases like St. Vincent talked about. So I think your answer will be the same, but I want to hear it. With respect to the stock fund, and the question is whether or not you get retail or institutional shares, and let's assume that they pled that institutional shares were significantly cheaper, why doesn't that say differently? So a couple of reasons. As the court below pointed out, and as their own complaint points out, and as Mr. Wolfe again said today, here in this Court, that claim really collapses on the question whether or not the revenue sharing that's used from the retail share class is too excessive. Their brief at page 41 says the explanation, the response, that the retail share classes are using revenue sharing to defray expenses hinges, this is their word, hinges on whether or not those, the compensation was too excessive. And that's all about Claim 3. So there really is no independent claim that it was imprudent to use retail share classes because their own complaint pleads at paragraph 120. This is their complaint, that the revenues from the retail share classes, that delta between the retail class and the institutional class, was used to pay expenses. That the participants under the plan terms were supposed to pay them, were owed by them, so this was a way to cover those expenses. Everybody agrees that that's what happened with these funds. They say, and he said it again this morning, that that's not a good enough answer because he says, they allege, that the compensation was excessive as a result. That's all about Claim 3. So let's turn to Claim 3. What are the problems with that claim? The court below found four problems with all of which, with that claim, all of which are sufficient independent reasons to affirm the dismissal. One is that the complaint doesn't actually allege what the fees were. There's a number, $109, that's repeated this morning, but it turns out that there's no basis for, in the briefs below you can see, they say that's just an estimate of what the recordkeeping fees were. There's no actual information, concrete information, alleged that that was the recordkeeping  But I don't think that's true. Scalia, as I understand it, recordkeeping fees are based on a percentage of revenue, at least during the time period. Until 2012, that's exactly correct. Okay, so wouldn't it be pretty simple to see what revenue was during that time period and figure out what the fees are? Sort of, is the answer again. You may not know how that broke down per participant, but you'd certainly know what the gross fees were. The only caveat is the percentage, the expense ratio percentage and the amount, you don't even know exactly what's taken from that for the revenue sharing, but even that amount covers things other than recordkeeping, so you don't know exactly what the recordkeeping Okay, but I take it they're point, and I know Judge Hawkins had a question. I take it their point is that when you compare this to the options for recordkeeping fees, then there are obviously cheaper options for recordkeeping fees than this one that you eventually abandoned or changed. So why isn't that enough to suggest that the fiduciaries weren't doing their job when figuring out what the recordkeeping fees should be? So the first answer is the point that we don't actually even know what that number is, but if you're accepting that they plead enough to get the... Well, if you don't know what that number is, then maybe they have a good claim. I'm just, well, I'm just, I think we know what it is. The point is they have to allege concrete facts of permitted inference that it was excessive, and they don't actually allege what the number is. But there's a second answer, which I think is equally or even more persuasive, which is by definition what's referred to as asset-based compensation is hindsight, because what happens is you negotiate a deal, in this case in 2002, to provide compensation based on the size and growth of assets. You don't know in 2002 or at any point along that continuum what next year's compensation is going to be, exactly how much the assets are going to grow. And so what happened is in the class period here, 2010 to 2012, we'll all recall the economy recovered from a devastating financial crisis. Assets grew substantially. The compensation there, we don't know what it was exactly, but it surely grew substantially. But nobody knew in 2010 that was going to happen, and we didn't know if there was going to be another cliff, if a number of, there'd be layoffs at Chevron, which would shrink the size of the plan. Nobody could know that. What did happen, which we know from their own allegations, is that assets increased, compensation increased, and what did the prudent fiduciaries of Chevron do? They renegotiated the compensation after two years of growth, actually just a little more than a year of growth, excuse me, two years of growth in that period, and went to a fixed per participant fee model. Based on those allegations, there's no way to infer that the fiduciaries were employing an imprudent process just based on the idea that asset-based compensation went up rather than down, or was not just, you know, the Goldilocks standard of perfect for the two-year period. You couldn't know what it would have been. And when it was substantial and growing, it was renegotiated. Just what you would want a prudent fiduciary to do. There's also no allegations, a third distinct point, that any other, that Vanguard itself or any other record keeper in the market before 2012 would have accepted lower compensation. There's no concrete basis for that. They say it was excessive, but that's all they say. It's a conclusory allegation, which we know from Twombly and Iqbal and other cases is not permissible. Is there, when I read the complaint, I was, is there a complaint that said, is there an allegation that there were lower, let me use revenue-based, fees available during the time period from comparable competitors that weren't big shareholders of Chevron? I don't recall that there's any sort of concrete allegation other than the conclusion that it was excessive. For example, what Your Honor just put your finger on. For example, Fidelity charged. That's what's missing. A quarter of a point, and Vanguard charged half. And everybody knows Fidelity is as good as Vanguard, so why not them? That, and that's exactly what's missing. That kind of concrete allegation, which is perfectly available to plaintiffs, you know, to just go out there and look in the market in preparing their case to make an actual concrete allegation of excessiveness, you would have to point to other providers who at that time were as good and would provide equal services for a substantially less amount. Roberts. Can we talk about the prohibited transaction claims? The district court found them time-barred? Yes. Wasn't at least one payment to Vanguard within the statute? I think there was a payment to Vanguard. But what the district court held is a payment does not qualify as a transaction within the means, within the meaning of Section 406. Even under Northrop? Even under, well, Northrop, I mean, is not controlling on this court. But what the Northrop district court held was that in that circumstance, there were a series of transactions because each year the contract was re, not renegotiated necessarily, but re-evaluated and re-approved, formally re-approved. So the court was saying there was effectively a new contract at each year. That was a transaction. The court wasn't saying that absent that kind of transaction, the mere payments, the mere operation of the contract is itself a prohibited transaction. Now, we know the plaintiffs are Why isn't the renegotiation of the fee schedule, in effect, a new transaction for those purposes? That would be. But that's not what they're alleging is the prohibited transaction. The prohibited transaction was the revenue asset-based compensation up until 2012 because they know they have a problem with the defense to a prohibited transaction under Section 408 as long as it's not excessive. But we're not talking about substance on these claims. We're talking about timeliness, right? Yeah, absolutely. But when they're talking about the claims, what they say in their brief, and I think they're held to their brief, is that this claim is timely because there were payments made during this period. And that, and what they're talking about is the payments that were made pursuant to the pre-2012 asset-based compensation arrangement, which was entered into in 2002, way outside the 60-year limitation period. So you don't think their pleadings and brief are susceptible of the reading that were challenging payments made pursuant to the post-2000, is it 2012 arrangement? I don't think so. I think they're focusing on the transaction, what their First Amendment complaint says in paragraphs 166 and 167 is the transaction that they chose to identify was the asset-based compensation transaction in 2002. That's what they refer to as the transaction. Because I guess my question is, if that were a prohibited transaction, wouldn't the same logic apply to the subsequent transaction? I mean, that certainly would be a transaction entering into the record-keeping arrangement in 2012. We're not resisting that. No, no, I'm saying, I'm trying to figure out why one would be a prohibited transaction and the other would not. Well, so a couple of points. The only question here is whether the challenge to the first transaction is timely. So we're assuming that it was prohibited for a purpose. That 2002 was a transaction. 2012 was a transaction. They're only challenging the 2002, and that's untimely. So that's... You don't brief the 2002 as to whether or not it was, in fact, a prohibited transaction. I don't believe so, because we didn't take that to be their argument. It's their argument and their complaint about the district court's holding is that she got it wrong because they think under Grumman and under Tibble, that 2002 transaction was continuing on. Right, and to be fair, I don't think the other side says we're making a separate attack on different transactions. That's why it's timely. They said the payment's continued. Right. But I just, I was trying to figure out why, under the logic, the second one wouldn't be as prohibited as the first. I mean, it would be a transaction. We don't think it would ultimately be prohibited. You'd have to get them to get to prohibition. Right, and it wouldn't be. And I think that's the reason they don't challenge it, is they've got no chance of prevailing, pleading a plausible claim there, because there clearly is not an argument or even an allegation that the compensation reached in 2012 was excessive, which it has to be ultimately for it to be prohibited. Unfortunately, you've reached the rest of your time also. Thank you, Your Honors. We thank both sides for their briefs and arguments. And this case will be submitted. The final case on our calendar this morning is Espiritu versus Capital One.
judges: Hawkins, Hurwitz, Eaton